**DELTA RICE MILL, INC., Appellant,**

v.

**GENERAL FOODS CORPORATION, Appellee.**

**DELTA RICE MILL, INC., Appellee,**

v.

**GENERAL FOODS CORPORATION, Appellant.**

**No. 84–1626, 84–1662.**

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1985.

Decided June 6, 1985.

Rehearing and Rehearing En Banc Denied Aug. 14, 1985.

Herbert C. Rule, Little Rock, Ark., for appellant.

Stephen M. Reasoner, Jonesboro, Ark., for appellee.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.

SACHS, District Judge.

In this diversity of citizenship case, both parties to a contract dispute appeal from the judgment entered by the district court.[1] The district court entered judgment in favor of plaintiff Delta Rice Mill, Inc. on plaintiff's breach of contract claim against defendant General Foods Corporation, in the amount of $314,448.10. For reasons stated in a reported decision, however, the district court granted judgment in favor of defendant, notwithstanding the verdict, on plaintiff's claims for bad faith misconduct and for punitive damages. *Delta Rice Mill, Inc. v. General Foods Corp.*, 583 F.Supp. 564 (E.D.Ark.1984). The jury had rendered a verdict in plaintiff's favor for compensatory damages in the amount of $22,000 on the bad faith claim and in the amount of $731,000 for punitive damages. We affirm.

---

\* The HONORABLE HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas.

Delta Rice has been a supplier of rice to General Foods. The controversy in this case arose from General Foods' rejection of 17,000 hundredweight of rice which was shipped in nine hopper cars to General Foods' Dover, Delaware, facility. General Foods rejected the rice, purportedly because of poor quality; this rejection of the rice occurred after a decline in the market price. Delta Rice contends that General Foods adopted unusual and unauthorized testing procedures in order to avoid buying plaintiff's rice at the price agreed upon before the market dropped. In contrast, General Foods asserts that it was truly concerned about the quality of the rice, that it stepped up its testing procedures because of those concerns, and that the rejected rice was not priced greatly in excess of the prevailing market for rice.

*Count I—Breach of Contract*

The factual contentions relating to breach of contract have been decided against General Foods by the jury and have been reviewed again on post-trial motions by the district judge. While General Foods as cross-appellant urges us to reverse the breach of contract judgment, oral argument suggests that its principal objective is to avoid reinstatement of the jury verdict for punitive damages.

■ We conclude that Delta Rice presented a submissible case on the breach of contract claim. The rejected rice had been certified as meeting Department of Agriculture standards. There was also some evidence through a General Foods employee that its specifications were essentially the same as the Government's, and that any differences between the standards and its specifications were not material to the quality complaints made by General Foods after retesting the rice. In its reply brief, General Foods acknowledges that there was an issue of fact as to whether the rice shipped met USDA # 1 grade stan-

dards. The ultimate questions were therefore fact issues for the jury.

■ General Foods complains that the trial judge erred by excluding certain rice samples from jury consideration. The samples were not part of the original testing samples but were taken after the decision had been made to reject the rice. Although purportedly taken from the same cars for Department of Agriculture review, they were taken from six of the eight rejected cars. The rice was tendered for illustrative purposes "to help the trier of fact visualize what out-of-specification rice looks like." Recognizing a potential for improper prejudice and likelihood of jury confusion, the trial judge sustained plaintiff's objection to use of the samples. The ruling was well within the discretion of the trial judge, as defendant's attorney tacitly conceded at trial, given the special circumstances under which the samples were taken, the lack of relationship between the samples and the decision to reject the rice, and the possibility of illustrating the issues without using rice purportedly supplied by plaintiff. General Foods has fallen short of establishing "a clear and prejudicial abuse of discretion" in rejecting evidence, as required for reversal. *SCNO Barge Lines, Inc. v. Anderson Clayton & Co.*, 745 F.2d 1188, 1192 (8th Cir.1984).

The judgment as to Count I (breach of contract) will therefore be affirmed, subject to modification to reflect an agreement between the parties as to interest.[2]

*Count II—Bad Faith*

Turning to the appeal by Delta Rice, seeking reversal of the judgment notwithstanding the verdict, we first examine Count II, in which plaintiff sought recovery of compensatory damages for "bad faith as an actionable tort," and obtained a verdict (thereafter set aside) for $22,000.

The claim was a novel one, not yet established by the Arkansas courts except in the context of claims against insurers. Wheth-

**2.** Delta Rice represents, and General Foods does not deny, that the parties have agreed that interest to the date of judgment should be allowed at the rate of 6% per annum from the date the invoices were due, and at the rate of 9.86% per annum after judgment. The district court is authorized to modify the judgment to reflect any such agreement.

er bad faith attempts to avoid liability or outrageous conduct by a contracting party will be generally recognized as giving rise to tort liability is an open question under Arkansas law. *See* Note, *Aetna v. Broadway Arms: The Tort of Bad Faith Breach,* 38 Ark.L.Rev. 462, 475 (1984). The only Arkansas cases we have been able to find upholding liability on this theory have involved insurance contracts. *See, e.g., Employers Equitable Life Insurance Co. v. Williams,* 282 Ark. 29, 665 S.W.2d 873 (1984); *Aetna Casualty and Surety Co. v. Broadway Arms Corp.,* 281 Ark. 128, 664 S.W.2d 463 (1984); *Findley v. Time Insurance Co.,* 264 Ark. 647, 573 S.W.2d 908 (en banc 1978).

Despite some doubt that insurance case principles were applicable (583 F.Supp. at 565) the district court submitted plaintiff's claim under an instruction derived from the insurance cases. The gist of the instruction was that liability for damages could be assessed if "General Foods, without a good faith defense, actively engaged in dishonest, malicious or oppressive conduct in order to avoid liability."

A prototype case is *Aetna Casualty and Surety Co. v. Broadway Arms Corp.,* 281 Ark. 128, 664 S.W.2d 463 (1984). Plaintiff there contended that the insurer's representative had said that the alleged loss, which greatly exceeded the book value of property, would be "difficult to explain to the IRS." The Arkansas Supreme Court said it was probable the statement was "intended to put some type of pressure upon [the] insured to settle the claim." *Id.* at 466. This is apparently the sort of activity that may be characterized as "oppressive conduct" used to avoid liability when there is no "good faith defense" to a claim.

In its post-trial review of the evidence, the court below listed four subjects of complaint, only one of which appears to be related to an attempt to avoid liability:

"Defendant made repeated inspections of the rice by means contrary to its own policies." 583 F.Supp. at 566. Observing that there was a clause in the written contract affording a right to inspect the rice upon arrival at General Foods' Dover facility, the court concluded that this inspection "gave General Foods a good faith basis to believe that the rice did not conform to the requirements under the contract." *Id.* Defendant's conduct was said to be "indicative of negligence and poor judgment" but was deemed insufficient to establish a claim of bad faith, under the standard required by the Arkansas courts in insurance cases. *Id.*[3]

Delta Rice has summarized its complaints concerning the methods used by General Foods in retesting the rice as follows: "[I]t broke its own rules by taking samples with the wrong probe, by sampling hopper car compartments 20 to 50 times each, by grading the samples separately instead of as a composite, by ignoring the USDA No. 1 certificates ... and by pretending, when it knew this was not so, that its specifications were different from the USDA." On the other hand, Delta Rice does not here claim error in the trial court's ruling sustaining the contract right of General Foods to inspect its rice at the Dover facility and does not dispute that Department of Agriculture testing personnel at Houston and Kansas City, using samples from the shipment supplied by General Foods, subsequently disagreed with the approvals given by Department employees in Arkansas. In other words, the trial testimony showed that the quality of plaintiff's rice was hotly contested. Plaintiff's objections go more to procedural irregularities than to the substance of the quality issue. The jury's verdict for Delta Rice on the breach of contract issue is not inconsistent with the trial court's ultimate conclusion that there was a real, unfeigned controver-

---

**3.** This court likewise views the Arkansas test for a vexatious refusal to pay insurance claims as being a rigorous one, difficult to satisfy. A recent Eighth Circuit decision affirmed a directed verdict for an insurer on a tort claim similar to the one at bar, concluding that there was no evidence from which a jury could soundly infer that the insurer at any time "acted in bad faith with an intent to harm" the insured. *Smith v. Union Mut. Life Ins. Co.,* 726 F.2d 437, 440 (8th Cir.1984).

sy as to liability, and that the defense, while faulty according to the verdict, and the result of "negligence and poor judgment," according to the trial judge, was not wholly unreasonable, frivolous, or fairly described as dishonest.

While Delta Rice roundly condemns General Foods, we do not read the briefs, or the transcript, as indicating that Delta Rice believes it could prove that it has been victimized by fraudulent testing at Dover. A simple claim of fraud, while hard to prove, would have presented a different case.

The Arkansas decisions appear to be consistent with the general rule, frequently applied to insurers, that a failure to make payment of a sound claim can be characterized as a "bad faith refusal to pay" only if there is no genuine issue or controversy between the parties that would justify litigation. *See Norman's Heritage Real Estate Co. v. Aetna Cas. & Surety Co.,* 727 F.2d 911 (10th Cir.1984); *Winningham v. Centennial Ins. Co.,* 708 F.2d 658 (11th Cir.1983); *Safeco Ins. Co. of America v. Guyton,* 692 F.2d 551, 557 (9th Cir.1982). Perhaps because instructions submitting this issue to the jury are in necessarily general terms, encompassing issues of law, it is not unusual for judges to assume the final responsibility for deciding, as a matter of law, whether the plaintiff has established the tort of bad faith refusal to pay. In all of the above cases, as well as in this court's recent decision in *Smith v. Union Mut. Life Ins. Co., supra,* the issue was decided at the trial level or on appeal as a matter of law. Judgments notwithstanding the verdict, as in this case, were affirmed in the Tenth Circuit case, cited above, and directed in the Eleventh Circuit case.[4]

■ Viewing the evidence in the light most favorable to Delta Rice, as we must

in reviewing the judgment notwithstanding the verdict, *see SCNO Barge Lines, Inc. v. Anderson Clayton & Co.,* 745 F.2d at 1192; *J & J Farms, Inc. v. Cargill, Inc.,* 693 F.2d 830, 834–35 n. 1 (8th Cir.1982), we conclude that the district court soundly ruled that evidence relating to the inspections by and at the request of General Foods did not authorize the Count II recovery for "bad faith as an actionable tort."

While the Count II claim is analogous to claims of bad faith refusal to pay insurance claims, and most of plaintiff's citations are to insurance law, another theme in plaintiff's briefing asserts that it has proved "misfeasance," perhaps more meaningfully described as "liability in tort for misperformance of a contract." *W. Prosser,* Handbook of the Law of Torts § 92, p. 617 (4th ed. 1971). Tort recovery on this theory is illustrated by a recent Eighth Circuit case. *Red Lobster Inns of America, Inc. v. Lawyers Title Ins. Corp.,* 656 F.2d 381 (8th Cir.1981). In *Red Lobster* a title insurer was held liable for misperformance; its negligent performance of contractual duties was deemed tortious. But the undertaking in this case, to pay for purchases, is similar to an employer's duty to pay wages in employment cases. It is generally held that employee discharge cases cannot be characterized as misperformance of a contract even if some affirmative acts are involved in a breach of the employment contract. *Prosser,* Torts, p. 618. The question seems to turn on whether the basic contract is treated as one requiring active performance (for which there can be tort recovery for misperformance) or whether there has essentially been a nonperformance of the basic contract obligation. It seems analytically necessary to call this a nonperformance case, and no contrary authority has been cited.

**4.** Questions of bad faith refusal to pay are of course for the jury in some circumstances. *deVries v. St. Paul Fire and Marine Ins. Co.,* 716 F.2d 939 (1st Cir.1983). The *deVries* opinion shows the extreme difficulty encountered by courts in articulating the applicable standards. The vagueness of the terminology gives special

cause to question the jury's grasp of the legal standards to be applied. The opinion also shows that heightened (but inexact) requirements are generally used for proving the tort of bad faith, as distinguished from concluding that there has been bad faith in other contexts. 716 F.2d at 943–44.

■ We have considered all of plaintiff's claims of misconduct by defendant, including the four contentions specified by the trial judge. 583 F.Supp. at 566.[5] The complaint about inspections has previously been analyzed more closely, because, as in *Broadway Arms*, it relates to resisting payment of a contract obligation. That was the issue submitted to the jury. The other claims, if accepted by a trier, fairly subject defendant to criticism for mismanagement, poor judgment, and insensitivity to plaintiff's precarious economic condition. We agree with the trial judge, however, that they do not subject defendant to liability for the tort of bad faith, as that doctrine has been developed in the Arkansas cases. In any event we owe deference to the views of the experienced trial judge, in his reading of the current status of the common law of Arkansas.[6]

Defendant was therefore entitled to judgment in its favor on Count II.

*Punitive Damages*

■ Because plaintiff did not prevail on its tort claim, the punitive damage award must necessarily fail, insofar as it rested on Count II. Insofar as the award may have been based in part on the recovery for breach of contract, under Count I, we agree with what the district judge said on this subject (583 F.Supp. 566–67) and we also conclude that the bar to punitive damages in the contract action has been strengthened by a recent decision of the Arkansas Supreme Court. *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984). That decision reaffirms a sharp distinction between damage expo-

sure for torts and on breach of contract claims.

Using a rationale attributed to Justice Holmes, the Supreme Court of Arkansas recognized "the option to breach a contract and pay damages if it is more efficient to do so." *Id.*, 665 S.W.2d at 280. This theory logically results in a limitation of breach of contract damage exposure to losses contemplated by the contracting parties, and for which a defendant "at least tacitly agreed to assume responsibility." *Morrow v. First National Bank of Hot Springs*, 261 Ark. 568, 550 S.W.2d 429, 430 (1977). Exercise of the "option" of nonperformance does not in itself create exposure to punitive damages. *L.L. Cole & Son, Inc.*, 665 S.W.2d at 280. The Arkansas Supreme Court further ruled in *L.L. Cole* that tort claims must be separated from breach of contract claims, and that if punitive damages are sought, they are dependent on the success of the tort claims. 665 S.W.2d at 281.

As applied to the case at bar, *L.L. Cole* teaches that no punitive damages could be allowed under Count I, and their submissibility was dependent on liability under the bad faith claim asserted in Count II. Our ruling on Count II is therefore dispositive of the punitive damage claim.

Having reviewed all contentions of the parties, we conclude that, except for the interest modification noted above, the judgment of the district court should be and is hereby affirmed.

---

**5.** 1. Existing economic conditions required a reduction in defendant's rice requirements, but despite its reduced needs, defendant ordered plaintiff to ship the remaining nine cars in mid January, 1983.

2. Assuming the rice shipped by plaintiff was defective, as claimed by defendant, defendant did not disclose or assert that claim until it had held or possessed the rice for approximately three to four weeks. Moreover, defendant in early February stated that it was rejecting the rice; then two weeks later defendant said the rice was on "hold."

3. Defendant made repeated inspections of the rice by means contrary to its own policies.

4. Defendant's use of one of the cars of rice without paying for it at a time that defendant knew that plaintiff was in the midst of financial difficulties.

**6.** Plaintiff contends that the trial judge simply interposed a different view of the facts from that of the jury. We believe the trial judge in no sense misapprehended his role, but properly applied his concept of the appropriate legal standards, in accordance with Arkansas law.